F I L E D

JUL 2 4 2012

CLERK, U.S. DISTRICT COURT
ALEXANDRIA, VIRGINIA

IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

UNITED STATES OF AMERICA          )
                                  )
                                  )
            v.                    )      1:10cr438  (LMB)
                                  )      1:12cv077  (LMB)
                                  )
LOIS SETTLE SMITH,                )
                                  )
            Defendant.            )

## MEMORANDUM OPINION

Before the Court is Lois Settle Smith's ("Smith" or
"movant") pro se Motion to Vacate, Set Aside, or Correct
Sentence by a Person in Federal Custody Pursuant to 28 U.S.C.
§ 2255 ("§ 2255 Motion" or "Motion"), in which Smith argues that
she received constitutionally ineffective assistance of counsel
by her retained attorney and that the Government engaged in
misconduct. The Government opposes the Motion on the grounds
that defense counsel's performance was not substandard, much
less prejudicial, and that the misconduct claims were
procedurally defaulted and are, in any event, entirely
unsubstantiated. See Gov't Answer Opp'n Pet.'s Mot. Pursuant to
28 U.S.C. § 2255 ("Answer") at 5-6, 22. For the reasons
discussed below, an evidentiary hearing is unnecessary and the
§ 2255 Motion will be dismissed on the basis of the pleadings
and the record developed in the underlying criminal case.

## I.    BACKGROUND

Smith was indicted on November 18, 2010 for conspiracy to distribute oxycodone in violation of 21 U.S.C. § 846 (Count I), distribution of oxycodone in violation of 21 U.S.C. § 841(a)(1) (Count II), and possession of a firearm in furtherance of a drug trafficking crime in violation of 18 U.S.C. § 924(c) (Count III). See Dkt. No. 20.[1] She retained attorney Alexis Marie Downing ("Downing" or "counsel"). On January 21, 2011, Smith pled guilty without a formal plea agreement to Count I, and the Government dismissed Count II; however, it refused to dismiss Count III. See Dkt. No. 97 (plea hearing transcript); Gov't Supplement to Resp. in Opp'n, Aff. of Alexis Marie Downing ("Downing Aff.") ¶ 10.

Smith waived her right to a trial by jury in favor of a bench trial on the firearm charge. See Dkt. No. 85. On January 31, 2011, after a one-day bench trial, the Court found Smith guilty as to Count III based on evidence far beyond a reasonable doubt that the firearm was possessed to further the drug trafficking conspiracy charged in Count I. That evidence included:

- Smith's recorded statements to Government witnesses Anthony and Nichole Smith during a controlled drug purchase on September 16, 2010, in which Smith gestured at her firearm,

---

[1] Smith's husband, Joseph Smith, and their son, Warren Smith, were also charged in Count I, and Joseph Smith was charged in Count IV.

part of which Nicole Smith saw in the backseat of Smith's Jaguar, and told these witnesses that she intended to bring it to a drug buy in Florida with Jamaican sellers:

> **Lois Smith ("LS")**: We're supposed to meet a woman. . . . We don't know these people. They're black. . . . And they got Jamaican accent.
> . . .
> **Anthony Smith ("AS")**: A little scary, huh?
> **LS**: Yeah, you know, and how am I-- . . . Where am I going to go to count 500 pills and do the exchange . . . unless we get a motel room. . . . I got on the Internet this morning and I looked about – well, I got my concealed weapons permit. And I'm thinking, well, Florida is okay with that. So I may carry it—
> **Nichole Smith ("NS")**: Yeah
> **LS**: And hopefully I don't have to use it.
> **AS**: (Laughter)
> **LS**: But I swear to God, if I had to, I would just have to . . . . I really don't feel scared. But I feel like, you know, this is really – you know, this – I'm getting into this stuff like, you know, I'm really a drug dealer.
> **AS**: Huh. When you see something on, you know, on TV where people—
> **NS**: You're so funny—
> **AS**: You know, people go into drug deals like that and people end up getting killed—
> **LS**: I know.
> **AS**: And people in jail, jail for the rest of their lives—
> **LS**: Yeah, I've seen it on TV all the time.
> **AS**: That's not really worth it, (laughter), you know?
> **LS**: No, no. But I would say this is a terrible mistake.
> **AS**: Your life ain't worth it.
> **LS**: No . . . You know, if something come down, I say, you know, this is a terrible mistake. . . . These people followed me in here. I don't know what in the hell they want.
> **AS**: (Laughter)
> **NS**: Right
> **LS**: Get them out of here. I'm scared. (Laughter)
> **NS**: So it's not somebody you know?

> LS: No. I've only met her, like, once and she's
> been calling me, like, five times.

See Gov't Ex. 2A2 at 2-5 (transcript).

- Smith's recorded statements to Anthony and Nichole Smith
  during a second controlled drug purchase on September 24,
  2010, during which she described meeting with the sellers
  discussed in the September 10, 2010 recording and deciding
  not to finalize the purchase as a result of her discomfort:

  > AS: You didn't kill no Jamaicans, did you?
  > LS: Huh?
  > AS: You didn't kill no Jamaicans, did you?
  > LS: No. I took my pistol with me, though. It's
  > still in here.

  See Gov't Ex. 2B2 at 3 (transcript).

- Smith's testimonial inconsistences as to whether the
  firearm had been in her car during the drug transactions
  and her trip to Florida, which undermined her credibility
  in light of the audio recordings and her testimony at the
  preliminary hearing indicating knowledge that the firearm
  was in the car. See Dkt. No. 174 at 263:21-266:7, 267:14-
  268:18, 278:2-279:8.

- The October 26, 2010 seizure of the loaded firearm from the
  Jaguar. See id. at 177:3-7.

- Smith's testimony that she was carrying a significant
  amount of cash and significant number of drugs while making
  trips to Florida. See id. at 287:21-288:10.

- Records showing that Smith applied for a concealed weapons
  permit in April 2010 when her drug dealing was also
  increasing. See id. at 253:17-25 (Smith confirming that she
  submitted two concealed weapons permits in April 2010),
  38:9-39:2 (Warren Smith testifying that Joseph and Lois
  Smith began selling drugs directly to Anthony Smith in
  early 2010), 43:1-24 (Warren Smith testifying that Joseph
  and Lois Smith began traveling to acquire drugs in fall
  2010).

Smith argued that she needed the firearm for protection
against the bears that roamed her rural property. The Court

4

found this defense incredible given Smith's health conditions that left her relatively sedentary and the fact that a handgun is not the likeliest weapon to ward off bears. See id. at 291:13-292:5, 314:22-317:18.

The firearm charge carried a five-year mandatory minimum sentence that had to run consecutive to any other sentence imposed in the case. See § 924(c)(1)(a)(i). On April 8, 2011, Smith was sentenced to 18 months incarceration on Count I and 60 months, consecutive, on Count III for a total sentence of 78 months, plus three years of supervised release. Final judgment was entered on May 12, 2011 after certain forfeiture matters were resolved. See Dkt. No. 156. Smith did not appeal either her convictions or her sentence but timely filed her § 2255 Motion. The Government has filed an Answer, including an affidavit from Downing, and movant has filed a reply.

## II.  DISCUSSION

### A. Standard of Review

A federal prisoner who collaterally attacks a conviction or sentence pursuant to 28 U.S.C. § 2255 may prevail only if she can show that the conviction or sentence was imposed in violation of the United States Constitution or laws, that the court lacked jurisdiction to impose the sentence, that the sentence was in excess of the maximum authorized by law, or that the sentence or conviction is otherwise subject to collateral

5

attack. Relief under § 2255 is designed primarily to correct for "fundamental" constitutional or jurisdictional defects and is therefore reserved for situations in which the failure to grant relief would "inherently result[] in a complete miscarriage of justice." United States v. Addonizio, 442 U.S. 178, 185 (1979)(internal quotation marks omitted). Where the movant argues the conviction violates the United States Constitution, she bears the burden of showing a substantial constitutional deprivation. See Clayton v. Haynes, 517 F.2d 577, 578 (4th Cir. 1975)(citing Johnson v. Zerbst, 304 U.S. 458, 468-69 (1938)); see also Widmer v. Johnston, 136 F.2d 416, 418 (9th Cir. 1943)("[T]he prisoner is under the burden of proving by a preponderance of evidence the facts which he alleges entitle him to a discharge.")(citations omitted).

Additionally, a § 2255 motion "may not do service for an appeal." United States v. Frady, 456 U.S. 152, 165 (1982). On collateral review, claims that were not raised on appeal, other than allegations of ineffective assistance of counsel, are deemed waived, and procedural default operates to bar such claims unless the movant can establish cause and prejudice or, in the alternative, actual innocence. See House v. Bell, 547 U.S. 518, 536-37 (2006); United States v. Maybeck, 23 F.3d 888, 891-92 (4th Cir. 1994). Cause for a procedural default on appeal requires a showing of some external impediment preventing

6

counsel from raising the claim. Murray v. Carrier, 477 U.S. 478, 492 (1986). Actual innocence means factual innocence, not merely the legal insufficiency of a conviction or sentence, and a movant "asserting innocence as a gateway to defaulted claims must establish that, in light of new evidence, it is more likely than not that no reasonable juror would have found [him] guilty beyond a reasonable doubt." House, 547 U.S. at 536-37 (internal quotation marks omitted); see United States v. Mikalajunas, 186 F.3d 490, 494 (4th Cir. 1999).

## B. Ineffective Assistance of Counsel

To sustain her § 2255 Motion based on ineffective assistance of counsel, Smith must satisfy the two-pronged test set forth in Strickland v. Washington, 466 U.S. 668 (1984), which requires a showing of both deficient performance by counsel and prejudice to the defendant. With respect to the first prong, Smith "must show that counsel's representation fell below an objective standard of reasonableness." Id. at 688. Because it "is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence" and because a wide range of legitimate defense strategies are possible in a given case, "scrutiny of counsel's performance must be highly deferential." Id. at 689.

Even were counsel's performance professionally unreasonable, Smith must also affirmatively "show that there is

7

a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id. at 694; see Fields v. Attorney Gen. of Md., 956 F.2d 1290, 1297 (4th Cir. 1992)(holding that where the defendant clearly could not meet the Strickland prejudice prong, the court did not need to consider the performance prong).

### 1. Counsel's Pretrial Performance

Smith alleges that counsel's pretrial performance was deficient because counsel did not explain the effect of Smith's jury trial waiver; neglected to advise her that the § 924(c) conviction carried a consecutive mandatory minimum sentence; inadequately investigated the firearm charge by, for example, not reviewing the Government's audio recordings or transcripts and the grand jury transcripts and not interviewing witnesses; failed to file pretrial motions to suppress and to dismiss the firearm count; and did not communicate with Smith. These claims will be addressed in turn.

### a. Waiver of Jury Trial

Smith asserts that "[c]ounsel advised me to waive my right to a trial by jury, without explaining the risks and benefits of doing so." This allegation contradicts Smith's jury trial waiver and her sworn statements during the plea colloquy. See United

States v. Lemaster, 403 F.3d 216, 220-23 (affirming summary

dismissal of a § 2255 motion alleging ineffective assistance of

counsel where allegations are inconsistent with statements made

during Rule 11 hearing). Smith signed a written Waiver of Trial

by Jury, which read:

> I, Lois Smith . . . having been furnished a copy of
> the indictment against me, having been fully advised
> by the Court or my attorney of the nature of the
> charge(s) against me, and having the possible sentence
> or sentences resulting from such charge(s), and having
> further been fully advised by the Court or my attorney
> of my right to a trial by jury, do hereby knowingly,
> freely and voluntarily waive trial by jury on said
> charge(s) and request and consent to trial by the
> Court without a jury.

See Dkt. No. 86. Moreover, following the acceptance of Smith's

and her husband's guilty pleas at the January 21, 2011 plea

hearing on Count I, the Court held the following colloquy with

both defendants, who had earlier in the proceeding affirmed to

answer all the Court's questions truthfully.

> THE COURT: Mr. and Mrs. Smith, did your lawyers
> discuss with you your right to have a jury trial on
> the gun counts?
> DEFENDANT LOIS SMITH: Yes, ma'am.
> DEFENDANT JOSEPH SMITH: Yes, ma'am.
> THE COURT: All right. Are you both comfortable in
> going forward without a jury and just having the judge
> hear the case?
> DEFENDANT LOIS SMITH: Yes, ma'am.
> DEFENDANT JOSEPH SMITH: Yes, ma'am.
> THE COURT: Has anyone pressured you into going that-
> making that decision?
> DEFENDANT JOSEPH SMITH: No, ma'am.
> DEFENDANT LOIS SMITH: No, ma'am.
> THE COURT: And do you feel you've had enough time to
> discuss the waiver with your counsel?

        DEFENDANT JOSEPH SMITH: Yes, ma'am.
        DEFENDANT LOIS SMITH: Yes, ma'am.

See Dkt. No. 97 at 60:3-20. In light of Smith's written

waiver and sworn statements, her claim that her jury trial

waiver was not knowing and intelligent is not credible.

        Moreover, Smith has made no showing that counsel's advice

to waive a jury trial was unreasonable. In fact, an attorney

frequently has valid strategic reasons for recommending that a

client choose a bench trial. See, e.g., Steele v. United States,

No. 04 Civ. 6918, 2005 WL 704868, at *11-12 (S.D.N.Y. Mar. 29,

2005)(collecting cases). Not only did Smith affirm orally and in

writing that she was waiving her right to a jury after

consultation with counsel, she does not explain why her

attorney's advice was unreasonable or how a jury trial would

have resulted in a different outcome.

                b. Sentence on Firearm Charge

        Smith complains that counsel never told her that the

firearm count carried a mandatory minimum sentence of five

years, to be served consecutive to the sentence imposed on Count

I. See § 2255 Mot. at 13. Yet, Smith's strategic decision to

plead to Count I, which did not carry a mandatory minimum

sentence, and to proceed to trial on Count III - where her only

chance at avoiding a five-year sentence was to be acquitted -

makes it reasonable to infer that she was aware of the penalties

                            10

she faced. In fact, elsewhere in her § 2255 Motion, Smith

complains that counsel "told me I'd be facing a 40 year sentence

if I went to trial on both counts," an "estimation [that] echoed

what the FBI agent kept saying" when she was arrested. Id. at 2.

These admissions in her own Motion contradict her claim that

Downing did not discuss sentencing with her. Moreover, Smith

cannot show prejudice from any failure to discuss the § 924(c)

sentence given that the statutory mandatory minimum applied to

the conviction, whether obtained through a plea or at trial.[2]

> c. Counsel's Investigation, Pretrial Motions, and
>    Attorney-Client Communication

Smith repeatedly argues that counsel engaged in "no pre-

trial investigation." See, e.g., § 2255 Mot. at 2-6.[3] Counsel's

---

[2] The Government "was adamant that any plea agreement . . . would
include the 924(c) charge, which Mrs. Smith vehemently denied."
Downing Aff. ¶ 10. The Court itself observed at the April 8,
2011 sentencing hearing that the Government had refused to
dismiss the firearm charge despite the significant exposure
Smith faced under the Guidelines for the drug conspiracy.

[3] The Government correctly argues that Smith's allegations that
Downing failed to investigate the firearm issue and failed to
move to dismiss the firearm charge seek to relitigate the
question of her guilt, not a proper use of § 2255. See Answer at
9. Moreover, Smith's conduct was clearly criminal under the
Fourth Circuit's interpretation of § 924(c):

> In order to prove a violation of § 924(c), the
> Government was required to present evidence indicating
> that the possession of the firearm furthered,
> advanced, or helped forward a drug trafficking
> offense. . . . [T]he factors to be considered include
> the type of drug activity being conducted, the
> accessibility of the firearm, the type of weapon,

sworn affidavit and the record in the underlying case contradict these assertions. Counsel avers that "[d]uring the three month period between the entry of my appearance and the trial . . . I engaged in extensive trial preparation." Downing Aff. ¶ 4. Specifically, counsel states:

> I conferred with Mrs. Smith on numerous occasions discussing topics including, but not limited to potential defenses, sentencing guidelines, the right to a jury trial, the right to testify, plea negotiations, forfeiture, and appeal. I obtained and read the grand jury transcript. . . . I received from the United States Attorney and reviewed thousands of pages of discovery and Jencks Act materials, consisting of FD-302 interview reports, Virginia Prescription Monitoring Program ("PMP") Reports dating back to 2006, photocopies of original prescriptions, pharmacy profile reports, Virginia State Police Investigation Reports, Cooperating Individual Agreements, audio and/or video surveillance and accompanying transcripts, FBI Lab Reports, approximately 260 photographs, Spring and Verizon phone records, and recorded jail telephone calls . . . . I provided Mrs. Smith with copies of a great number of documents for her review, primarily all FD-302 interviews, police reports, and transcripts of audio and video surveillance. I also summarized and reviewed other documents with her in person, including photographs and PMP reports, among others.

---

whether the weapon is stolen, whether the possession of the weapon is legal or illegal, whether the weapon is loaded, proximity to drugs and drug profits, and the time and circumstances under which the weapon was found.

United States v. Smith, 457 F. App'x 217, 218-19 (4th Cir. Dec. 8, 2011)(affirming co-defendant Joseph Smith's conviction on the firearm possession charged in Count IV)(citing United States v. Perry, 560 F.3d 246, 254 (4th Cir. 2009)).

Id. ¶¶ 4-6. Meanwhile, Smith points to no exculpatory evidence that she believes existed but was not reviewed by counsel.[4]

In addition, contrary to Smith's allegations, counsel did file a brief on the relevant legal standard for a § 924(c) conviction and argued a Motion to Suppress Evidence and Statements. See Dkt. No. 63.[5] Smith states that it "was not until [she] read Downing's affidavit that" she learned that Downing "had researched, wrote, and argued a pre-trial suppression motion[.] She never discussed nor gave me a copy of this motion" and did not inform her of its "content or [the] outcome of any hearing . . . ." Reply to Gov't Answer and Supplement to Mot. ("Reply") at 4. Yet, a review of the relevant minute entry shows that Smith was in the courtroom with counsel during the January

---

[4] None of the supposedly new facts that Smith lists at page 4 of her Motion changes the outcome. Most of these alleged facts are essentially what Smith unsuccessfully argued at trial.

[5] Although Smith contends that counsel's decision not to file a motion challenging the search and seizure of the firearm constitutes ineffective assistance of counsel, she offers no argument that the search warrants were not valid or properly executed. The Government observes that there "is nothing to suggest that law enforcement officers acted in bad faith or unreasonably (or that they even needed a warrant) when, after being told by [Smith] that she had 'a .38 pistol in the car, down beside the driver's seat . . .' they seized the weapon." Answer at 23. Furthermore, given "the location of the car [containing the firearm] on her property, its use in the drug trafficking, [movant's] recorded statements about keeping a gun in the car, Nichole Smith's testimony about seeing a gun in the car, and [movant's] statements on the day of her arrest about the gun being in the Jaguar, the discovery of the weapon was inevitable." Id. (citing Nix v. Williams, 467 U.S. 431, 448 (1984)).

19, 2011 hearing when the suppression motion was argued and denied from the bench.

Smith also alleges that counsel was deficient by failing to interview or subpoena witnesses. Downing explains that although Smith "did not provide the names of any witnesses to interview or call at trial" she nevertheless did interview one of Smith's employees, yet this "information . . . was not beneficial to Mrs. Smith's theory of the case." Downing Aff. ¶ 9. For her part, Smith does not provide the name of a single witness who Downing failed to call and whose testimony would have been helpful to her defense. Smith has not established any basis for holding an evidentiary hearing on this claim.

Smith argues in her reply brief that her "attempts to communicate with Downing throughout her representation . . . failed such that [she] was constructively without counsel" and that "the breakdown in our communication thwarted the mounting of an adequate defense." Reply at 3-4. This allegation contradicts her statement during the plea colloquy ten days before trial.

> THE COURT: Is [Downing] still your attorney in your view?
> DEFENDANT LOIS SMITH: Yes, ma'am.
> THE COURT: You have not hired a new attorney?
> DEFENDANT LOIS SMITH: No, ma'am.
> THE COURT: Are you at this time satisfied with the way Ms. Downing has been working for you in this case?
> DEFENDANT LOIS SMITH: Very much so, yes, ma'am.
> THE COURT: Well, what led to the problem between you

two?
DEFENDANT LOIS SMITH: My daughter. She kind of wanted
me to get another attorney to help out Ms. Downing
with a lot of stuff that she was doing, and my
daughter was kind of taking on a lot of stuff herself.
So at that point, she was very concerned about me, and
I think that was her step in trying to reassure that I
had all the defense that I could possibly get.

Dkt. No. 97 at 36:20-37:9. "Absent clear and convincing evidence

to the contrary, a defendant is bound by the representations he

makes under oath during a plea colloquy." Fields, 956 F.2d at

1288 (citations omitted)(rejecting ineffective assistance claim

where movant stated during Rule 11 hearing that "I am very

pleased with my counsel"). Smith may have had differences with

her counsel, but neither the above-quoted colloquy nor Downing's

performance establish a communication breakdown.[6]

    Given that Smith demonstrates neither deficient performance

nor prejudice with respect to Downing's pretrial performance,

all these claims fail.

    2. Counsel's Trial Performance

    Smith also assigns numerous errors to counsel's trial

performance, arguing that Downing was ill and that she failed to

---

[6] As an example of their communication breakdown, Smith complains
that "counsel 'shooshed' me, that is, told me to be quiet" when
Smith pointed out inaccuracies during trial. See § 2255 Motion
at 6. Counsel responds that she had explained that she had to
listen to the trial witnesses but provided Smith with a notepad
and pen to write notes and that she periodically asked Smith if
there were additional questions she thought should be asked. See
Downing Aff. ¶ 13.

cross-examine Nichole Smith, lodge objections, and prepare Smith to testify.

### a. Counsel's Health

First, Smith maintains that counsel was ill during the trial and prejudiced movant by not seeking a continuance. See § 2255 Mot. at 6; Reply at 9. Downing acknowledges that she had a "sore throat, cough[], and a runny nose" but adds that she "was not under a doctor's care or under the influence of any medication which would diminish" her cognitive abilities; rather, she maintains that she "was alert and [her] attention was focused" on the proceedings. See Downing Aff. ¶ 14. This accords with the Court's recollection. Even had a continuance been sought, the request likely would have been denied for so minor a physical ailment absent a forceful argument by counsel that she was truly unable to proceed.

### b. Cross-Examination and Objections

Smith disparages Downing's trial presentation, but these criticisms lack foundation. As the Government points out, in direct contradiction to Smith's assertions that Downing failed to cross-examine Nichole Smith, Downing did conduct cross-examination and in fact elicited testimony as to the evidence that Smith claims she overlooked. Compare § 2255 Mot. at 6-7, with Answer at 12-15, and Dkt. No. 174 at 152:21-159:25. For example, after Nichole Smith testified to having seen a gun in

Smith's Jaguar, counsel elicited testimony that established some minor discrepancies in Nichole Smith's description of the gun. Downing also highlighted the $1,200 payment Nichole Smith received to assist in the Government's investigation and Nichole Smith's comment that Smith was possibly "joking" when discussing the gun. See Dkt. No. 174 at 158:5-9, 159:9-17.

Smith also incorrectly claims that counsel failed to object to Government questions that raised the drug conspiracy to which movant had pled guilty. In fact, Downing made several objections, some of which were sustained and others overruled based on the Court's determination that such evidence was relevant to credibility on the firearm charge. See, e.g., Dkt. No. 174 at 270:5-10 (relevance objection sustained), 270:24-271:4 (relevance objection overruled), 293:10-294:8 (relevance objection sustained). What is more, as the Government correctly notes, the rules of exclusion are "relaxed significantly" in a bench trial. See Answer at 18 (quoting United States v. Musleh, 106 F. App'x 850, 856 (4th Cir. 2004)(per curiam)).

> [E]xcluding relevant evidence in a bench trial because it is cumulative or a waste of time is clearly a proper exercise of the judge's power, but excluding relevant evidence on the basis of "unfair" prejudice is a useless procedure. Rule 403 assumes a trial judge is able to discern and weigh the improper inferences, and then balance those improprieties against probative value and necessity. Certainly, in a bench trial, the same judge can also exclude those improper inferences from his mind in reaching a decision.

Schultz v. Butcher, 24 F.3d 626, 632 (4th Cir. 1994)(omitting citation); accord United States v. Hassanzadeh, 271 F.3d 574, 578 (4th Cir. 2001)(applying same rationale to hold that admission of prior conviction evidence in a bench trial did not violate Rule 404(b)).

### c. Smith's Testimony

Smith argues that counsel was deficient in failing to prepare her to testify in her defense. Specifically, she complains that counsel did not role-play and anticipate questions with her, tell her that questions had to be answered with a yes or no, or warn her that she "couldn't just tell [her] side of the story" and that Downing "did little to nothing to mitigate the damage of [Smith's] testimony." See § 2255 Mot. at 7. Smith admits that originally she had decided not to testify but, against Downing's advice, changed her mind during the course of the trial. Smith argues that when she chose to take the stand, counsel should have sought a one-hour continuance to prepare her. See Reply at 10.

Before testifying, Smith represented that she had had sufficient time to discuss the decision with Downing:

> The COURT: [M]y understanding is that Mrs. Smith is going to testify, correct?
> MS. DOWNING: Yes, Your Honor.
> THE COURT: All right. And again, Mrs. Smith, you've had enough time to discuss that decision with your attorney?
> DEFENDANT LOIS SMITH: Yes, ma'am, I have.

18

Dkt. No. 174 at 253:1-6. Although Smith now contends that she "was at a loss [as] to what [she] could say" and that she "expected to be able to tell [her] side of the case," a review of her testimony on direct examination demonstrates that she did tell her side. Compare Reply at 10, with Dkt. No. 174 at 254:5-255:6 (Smith explaining why she had a concealed weapon), 256:3-257:12 (characterizing her conversation with Nichole Smith as "joking"), 258:2-21 (pointing out perceived errors and discrepancies in Nichole Smith's testimony). Smith also faults Downing for failing "to mitigate the damage of" her testimony; however, she does not explain what "damage" she did on the stand and how it should have been properly "mitigate[d]" by her attorney.

In none of these respects did Downing's performance at trial fall below an objective standard of professional reasonableness, and even if it had, movant has offered no basis for concluding that she suffered any prejudice given the volume of evidence presented during the trial.

### 3. Counsel's Post-Trial Performance

Smith alleges that following trial, Downing neither reviewed nor filed objections to the presentence investigation report ("PSR") and that she neglected to submit a sentencing memorandum and inform Smith of her appeal rights. These allegations are without merit.

19

a. Representation at Sentencing

Smith argues that counsel was deficient with respect to sentencing.

> Counsel did not review the [PSR] with me. Rather, she told me to read over it and let her know of anything that was inaccurate, incorrect, or objectionable. Although I sent her a list of concerns, she filed no objections to the PSR. Nor did counsel prepare or file a pre-sentencing memorandum. Counsel was just as absent and uninvolved in the sentencing preparation phase as she had been theretofore. In hindsight, it is apparent that counsel's representation pre- and during trial was so abysmal that she could make no objections to the PSR without showing her deficiencies.

§ 2255 Mot. at 13. As with Smith's claim that Downing never filed a motion to suppress, her allegation that counsel did not engage in the pre-sentencing process is contradicted by the record.

On April 3, 2011, five days before the sentencing hearing, counsel submitted a thorough 15-page sentencing memorandum in which she objected to several factual statements in the PSR, contested the Guidelines calculations, and argued against certain sentence enhancements and in favor of a sentence reduction for acceptance of responsibility. She also addressed the 18 U.S.C. § 3553(a) factors and Smith's background, including her health challenges, dependency on prescription painkillers, lack of formal education, and role as primary caregiver to her young granddaughter. On April 7, 2011, counsel filed a supplemental sentencing memorandum opposing the

Government's calculation of the drug quantity for which Smith should be held responsible. Ultimately, counsel was successful because although the Guidelines recommended a term of incarceration between 235 and 293 months on Count I, the Court imposed a significantly variant sentence of 18 months on that count. There was nothing counsel could do to avoid the additional 60-month consecutive sentence for Count III, resulting in a total sentence of 78 months incarceration.

### b. Failure to File a Notice of Appeal

As an initial matter, Smith does not allege that she ever directed her attorney to file a notice of appeal and that counsel thereafter refused or failed to do so. See § 2255 Mot. at 14; Reply at 11 (admitting that she never expressed her desire to appeal to Downing); see also United States v. Peak, 992 F.2d 39, 42 (4th Cir. 1993)(discussing per se rule that failure to file a requested appeal constitutes ineffective assistance). Instead, Smith's theory appears to be that "when Downing . . . did not know what decision I had made about appealing, she should have filed the notice of appeal" anyway to preserve Smith's appellate rights. See Reply at 11. The Supreme Court, however, has refused to adopt such a rule. See Roe v. Flores-Ortega, 528 U.S. 470, 478 (2000)(rejecting argument that "[c]ounsel must file a notice of appeal unless the defendant

21

specifically instructs otherwise" and instead maintaining
Strickland reasonableness standard).

Because it is undisputed that Smith did not direct counsel
to file a notice of appeal, the next question is whether counsel
consulted with Smith. See id. Although Smith asserts that she
had no further contact with counsel following sentencing, the
record shows that Downing and Smith appeared in court on April
15, 2011, seven days after the sentencing hearing, for a
forfeiture hearing. See Downing Aff. ¶ 17; Dkt. No. 149 (minute
entry). Downing avers that at a meeting that morning before the
hearing, Smith "indicated to me that she did not wish to
appeal." See Downing Aff. ¶ 17.[7] Downing maintains that before
that, in preparation for the sentencing, she had "met with Mrs.
Smith on multiple occasions" and "discussed with [her] the
procedural aspects of an appeal. Namely, when it was to be filed

---

[7] Even had Downing failed to consult with Smith regarding a
possible appeal, such failure would constitute constitutionally
ineffective assistance of counsel in this instance only if it
was clear "a rational defendant would want to appeal." See
Flores-Ortega, 528 U.S. at 480. Given that Smith received a
dramatically below-Guidelines sentence on Count I after she pled
guilty to that conspiracy and that the Government could have
cross-appealed the sentence, a fact of which Smith was aware, it
cannot be said that any rational defendant would have wanted to
appeal. See § 2255 Mot. at 21, 24 (expressing her fear of cross-
appeal); see also, e.g., United States v. Cooper, 617 F.3d 307,
313-15 (4th Cir. 2010)(finding no error based on non-
consultation where, among other things, defendant received a
sentence at the low end of the Guidelines range after his plea);
Bednarski v. United States, 481 F.3d 530, 536 (7th Cir.
2007)(same).

[and] that the appeal could" challenge the Court's substantive findings and Smith's sentence. Id. ¶¶ 15-16. She also explained the Government's right to appeal and "the associated risks and benefits" of appealing. Id. ¶ 16.

In response, Smith merely maintains, without providing her own affidavit, that she has "absolutely no recall of [the April 15, 2011] proceeding" and "no memory of [Downing] meeting with" her, reiterating her position that the "last time I spoke with counsel was at sentencing." Reply at 6. Smith's unsworn and vague refutations that counsel failed to discuss appellate strategy or ask her whether she wished to appeal do not overcome counsel's unequivocal statements in her sworn affidavit that Smith told her she did not wish to appeal.[8]

---

[8] At other times in her pleadings, Smith insists that she "did not know that [she] had a right to counsel for the appeal" because "[s]omehow I had been led to believe that if I couldn't afford an attorney for appeal, I couldn't pursue it." Reply at 11. Smith, however, was clearly advised at the April 8, 2011 sentencing hearing of her appeal rights, including her right to court-appointed counsel if she could not afford an attorney:

> THE COURT: Mrs. Smith. I'm sorry, I did forget you have a right to appeal the conviction and sentence on Count 3 --
> DEFENDANT L. SMITH: Yes, ma'am.
> THE COURT: -- and that right to appeal will start to run once the final judgment is entered, and then within 14 days of that judgment entering, you must file a notice of appeal. You both have rights to counsel, and if for any reason you can't afford counsel, we'll appoint counsel for you for the appeal. We'll probably appoint both trial counsel.
> MR. GREENSPUN: Yes, ma'am.

The last piece of evidence contradicting Smith's claim that she wanted to appeal is Smith's conversation with Amy Bradley ("Bradley"), an attorney for her husband. There is no dispute that sometime after sentencing, Smith spoke with Bradley. See Reply at 7 ("[W]hen my efforts to connect with Downing failed, I would seek out Ms. Bradley."); Downing Aff. ¶ 17. According to Downing's affidavit, Bradley "advised [Downing] that Mrs. Smith had called" Bradley to seek her opinion on whether to notice an appeal. See Downing Aff. ¶ 17. "Bradley confirmed . . . that Mrs. Smith still did not wish to appeal . . . ." Id. Downing's characterization is undisputed by Smith.

Tellingly, the relief Smith now seeks is entry of a new judgment from which her appeal of the § 924(c) conviction can be taken "with full assurance that the time for the government to appeal the drug crime sentence is long past, such that there can be no cross-appeal." See § 2255 Mot. at 24.[9] The § 2255 Motion itself therefore gives rise to the inescapable inference that Smith made a strategic decision not to appeal to avoid the chance that the Government would cross-appeal her dramatically

---

THE COURT: Thank you.
DEFENDANT L. SMITH: Thank you.

See Dkt. No. 151 at 39:13-25 (emphasis added).

[9] Were the Court to enter a new judgment to enable movant to appeal her conviction, the Government would of course enjoy the same opportunity to appeal.

below-Guidelines sentence on the conspiracy charge. In light of this record, there is no basis upon which to find that counsel was ineffective with respect to Smith's failure to appeal.

The allegations of ineffective assistance before, during, and following trial fail under both prongs of Strickland. Although Smith may have experienced some dissatisfaction with her retained counsel, none of the allegations establish that counsel's performance was objectively professionally unreasonable. Moreover, the Motion is rife with specious allegations directly contradicted by the record, warranting dismissal of the claims without an evidentiary hearing.

### C. Miscellaneous Misconduct

Smith raises a series of claims that the Government improperly obtained and presented evidence against her, constituting prosecutorial misconduct. As an initial matter, Smith cannot sustain these claims because she procedurally defaulted them by not pursuing them through a direct appeal. To collaterally attack her convictions or sentence based upon these procedurally defaulted alleged errors, Smith must show cause and prejudice resulting from said errors. Mikalajunas, 186 F.3d at 492-93; see United States v. Pettiford, 612 F.3d 270, 279 n.7 (4th Cir. 2010)(reversing district court that "allowed [petitioner] to forego the burden of showing cause and prejudice

or a miscarriage of justice").[10] "The existence of cause for a procedural default must turn on something external to the defense," 186 F.3d at 493, such as the denial of effective assistance of counsel or "some interference by officials" that "made compliance impracticable," Murray, 477 U.S. at 488. The ineffective assistance claims rejected for the reasons stated above cannot establish cause for procedural default.

Smith alleges that an unnamed FBI agent "threatened" her and interfered with her appellate rights when he "told [her] son-in-law that the government could cross-appeal the drug crime sentence, and [she] would go down for life" if she appealed her conviction on Count III. § 2255 Mot. at 21. Smith alleges that as a result of the "terror" she thereby experienced, her "will and intent to appeal the gun conviction was totally overborne." Id. at 24. Construing this allegation as an attempt to establish cause, it is clear that Smith has failed to provide any context for the alleged conversation between this unnamed FBI agent and her son-in-law – namely, it is unclear when or where the conversation took place, why the two individuals were speaking

---

[10] A movant can also make a gateway showing of actual innocence through new evidence not previously available. See, e.g., Schlup v. Delo, 513 U.S. 298, 316-17 (1995)("Without any new evidence of innocence, even the existence of a concededly meritorious constitutional violation is not in itself sufficient to . . . allow a habeas court to reach the merits of a barred claim."). Smith offers no new evidence that she is actually innocent of the firearm charge.

to one another, and whether the agent's intent was even to communicate with Smith through the son-in-law. Moreover, what she describes as a terrorizing statement was, in fact, an accurate description of law, which is that the Government would be entitled to cross-appeal the below-Guidelines sentence.

Typically, official interference that would amount to cause involves conduct such as intentional concealment of facts, see Amadeo v. Zant 486 U.S. 214 (1988)(finding cause where county officials concealed racial disparity on jury lists); a false statement by an official impeding procurement of critical documents, see Parkus v. Delo, 33 F.3d 933 (8th Cir. 1994) (finding cause where state official's "untrue representation, made either intentionally or unintentionally," precluded movant from securing his mental health records); or a prosecutor's instruction to a witness not to reveal particular facts during trial, see Bliss v. Lockhart, 891 F.2d 1335 (8th Cir. 1989) (finding cause where prosecutor "either expressly or implicitly" communicated that a witness should avoid a subject during trial, which constituted "prosecutorial interference with disclosure of . . . full evidence"). The conduct Smith alleges hardly rises to the level of official interference with a defendant's rights, and she is therefore unable to establish cause for procedural default.

Moreover, even if procedural default did not operate to bar Smith's misconduct claims, she has failed to show "a fundamental defect which inherently results in a complete miscarriage of justice," or "present[] exceptional circumstances" making the "need for the remedy afforded by" a § 2255 motion "apparent." See Davis v. United States, 417 U.S. 333, 346 (1974). Specifically, Smith alleges that on October 26, 2010, in the course of executing an arrest warrant, police searched her home, car, and "cottage" and illegally seized her firearm located in the Jaguar parked on her driveway. See § 2255 Mot. at 14-17. Smith argues that the Government's search and seizure and reliance on this "tainted" evidence "so infected this case with unfairness as to amount to the denial of due process," requiring that her conviction and sentence be vacated. Id. at 16-17. Offering only her own unsupported assertions, Smith fails to provide a single piece of evidence or proper legal argument that the gun was seized in violation of her Fourth Amendment rights. See infra n.5.

Next, she alleges that the Government elicited false testimony from prosecution witness Nichole Smith by promising her "absolute immunity" but "only if [Smith and her] husband were convicted." Id. at 17. First, the immunity Nichole Smith was given was "use immunity" for which she "agree[d] to cooperate fully and truthfully with the government concerning

this investigation and any related matters." Gov't Ex. 3C (use immunity letter from United States Attorney to Nichole Smith requiring her "statements and testimony . . . to be truthful, candid, and complete"). Contrary to Smith's claims, offering use immunity is an entirely proper practice. United States v. Richardson, 195 F.3d 192, 195-97 (4th Cir. 1999)(recognizing "long-standing and consistent policy of authorizing and encouraging grants of leniency and immunity . . . in exchange for truthful testimony"). Prosecutors also acted appropriately when they revealed in their case-in-chief that Nichole Smith received both immunity and $1,200 for her assistance with the investigation.[11]

Smith's sole example of allegedly false testimony is her assertion that Nichole Smith's description of Smith's firearm "did not match the physical attributes of the gun entered into evidence." See § 2255 Mot. at 17. The minor discrepancies in Nichole Smith's description of Smith's firearm were fully probed during trial and made no material difference. Smith provides no

---

[11] Alleging that the Government "bribed" Nichole Smith and suppressed information subject to Brady v. Maryland, 373 U.S. 83 (1963), and Giglio v. United States, 405 U.S. 150 (1972), Smith argues that "to the best of my knowledge, the government did not disclose its contacts with [Nichole Smith]." See § 2255 Mot. at 20. Smith's baseless accusations contradict the trial testimony, through which the Government elaborated on its contacts with Nichole Smith.

basis for her claim that Nichole Smith lied on the stand or that the Government suborned perjury.

For all the aforementioned reasons, Smith's various claims of prosecutorial misconduct fail.

### III.   CONCLUSION

Because there are no factual discrepancies sufficient to justify an evidentiary hearing, and for the reasons stated above, Smith's § 2255 Motion will be dismissed based on the pleadings and the underlying criminal record, which conclusively establish that all of Smith's claims are meritless. An Order dismissing Smith's § 2255 Motion will issue with this Memorandum Opinion.

Entered this 24th day of July, 2012.

Alexandria, Virginia

/s/

Leonie M. Brinkema
United States District Judge